IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **THERESA BAKER, AS THE PERSONAL REPRESENTATIVE OF THE ESTATE OF RICHARD CHARLES WOLFE,**<br><br>PLAINTIFF,<br><br>vs.<br><br>**AMERICAN GREETINGS CORP.,**<br><br>DEFENDANT. | Civil Action No. 1:12-cv-00065 BYP<br><br>Class Action<br><br>Jury demanded |

## FIRST AMENDED COMPLAINT

As allowed by FED. R. CIV. P. 15(a)(1)(B), Theresa Baker, as the representative of the estate of Richard Charles Wolfe, files this first amended complaint and hereby seeks to recover the money American Greetings made by using, without permission or consent, the personal and private information of Richard Charles Wolfe and others like him. American Greetings used this personal information to buy and maintain secret insurance policies covering the lives of certain persons and to receive investment returns, interest, and the policy benefits upon their deaths. The Wolfe Estate asks the Court to certify a plaintiff class in this case.

### JURISDICTION

1.  The court has jurisdiction over these claims under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000. In addition, this case is a putative class action with more than $5,000,000 in controversy and the majority of class members located outside of Ohio. Venue is appropriate in this district because American Greetings is subject to personal jurisdiction in this district. 28 U.S.C. § 1391 (a).

## THE PARTIES

2. Theresa Baker is the representative of the Estate of Richard Charles Wolfe, deceased. Richard Charles Wolfe was an hourly-wage, rank-and-file employee of American Greetings prior to his death. He died on October 1, 2003 while residing in the state of Washington. He was survived by, among others, Theresa Baker, his daughter, who is the duly appointed personal representative of his estate.

3. American Greetings Corporation ("American Greetings") is an Ohio corporation headquartered in Cleveland, Ohio. Its principle place of business is One American Road, Cleveland, Ohio 44144.

### AMERICAN GREETINGS MISAPPROPRIATED EMPLOYEES' PERSONAL INFORMATION TO SECRETLY INSURE THEIR LIVES AND RECEIVE POLICY BENEFITS WHEN THEY DIED

4. Richard Charles Wolfe was employed by American Greetings before he passed away on October 1, 2003. American Greetings required Wolfe to provide his name, age, social security number, date of birth, sex and other information. Wolfe had a reasonable expectation that his name, age, social security number, date of birth, sex and other personal information that his employer compelled him to provide would be kept confidential and not used for unauthorized or illegal purposes.

5. In 1989, American Greetings began purchasing secret insurance policies on the lives of its employees which named American Greetings as the policy beneficiary. According to American Greetings, it bought the secret policies as a "low-risk means of generating annual positive cash flow" through the policies' internal build-up and the death benefits.

6. American Greetings first purchased from Mutual Benefit Life Insurance Company a master policy known as "MBL COLI Plan MB111." Attached to the master policy was a schedule which named the persons covered by the policy and assigned a unique policy number to

them (MB111-XXXXX). These policies had an effective date of August 1, 1989. American Greetings used the policies to insure only its "blue collar" employees—key executives were not covered by the policies.

7. The investment scheme was so successful that American Greetings bought additional polices from Connecticut General Life Insurance Company during December of 1991 and from Hartford Life Insurance Company during January of 1994.

8. The policies, often known as "dead peasant" insurance, covered American Greetings' rank-and-file employees. The policies were not "key man" insurance and the benefit amounts bore no relationship to the employees' value to American Greetings. American Greetings kept the policies in place even after the employee no longer worked for it. If an employee quit, retired, left on disability, or was fired, the policy on his or her life remained in force.

9. Before its insurers would sell the dead peasant policies, American Greetings had to provide a complete "participant census" describing the employees whose lives would be secretly insured for American Greetings' benefit. The required census data included the employees' last name, first name, middle initial, date of birth, employee number and social security number. Optional census data included the date of hire, department, job or employee class and salary or wages.

10. Thus, to buy and maintain the policies for itself, American Greetings used its employees' names, identities and a wealth of their personal information. For every covered employee, American Greetings used and gave to the insurance company and insurance brokers the employee's name, date of birth, age, sex, and social security number. American Greetings could not have bought the policies without this information. This personal and private

information was gathered by American Greetings at its home office in Cleveland, Ohio and transmitted to the insurer and brokers from Ohio.

11. American Greetings bought the life insurance policies in secret. It never informed its rank-and-file employees about the policies on their lives and did not ask them to consent to the insurance.

12. When employees and former employees covered by the policies died, American Greetings collected the policy benefits. American Greetings also received interest and investment returns from the policies.

13. To claim the death benefits, American Greetings was required to submit a claim form to its insurers. The information contained in the claim form included the deceased employee's full name, his or her residence, the place, date and cause of death, the place and date of the employee's birth, whether the employee was actively at work or retired, and whether the death was due to accident, suicide or homicide.

14. American Greetings used Wolfe's identity and personal information to buy a secret policy on his life and collected the policy benefits when he passed away. American Greetings received, in Cleveland, Ohio, net policy benefits in excess of $75,000 as a result of Wolfe's death. American Greetings also received in Cleveland, Ohio policy benefits from the deaths of its other covered employees.

**AMERICAN GREETINGS ACTIVELY AND FRAUDULENTLY CONCEALED THE POLICIES AND ITS MISCONDUCT**

15. American Greetings planned and implemented from the outset a multi-level process of concealing the policies' existence from its employees. Before it bought the first of its dead peasant policies, American Greetings had several meetings with James Campisi, a principle with the Newport Group, a brokerage firm specializing in placing and administering COLI

policies with large employers. American Greetings used Mr. Campisi's brokerage firm to buy its first policies from Mutual Benefit Life Insurance Company ("MBL"). According to American Greetings, "American Greetings entered the COLI plans as a cooperative partnership in connection with which all parties [the employer, brokers and insurers] undertook to work together to the mutual benefit and profit of all."

16. Mr. Campisi presented dead peasant insurance options to large employers through a presentation which was essentially standardized. Part of Mr. Campisi's presentation included an article describing the use of COLI policies to offset certain liabilities. The article specifically recommended that employers obtain employees' consent to the policies on their lives. As was his standard practice however, Mr. Campisi, counseled American Greetings against informing its employees about the policies. This recommendation was communicated at meetings and during discussions which involved Henry Lowenthal, American Greetings' senior vice president and chief financial officer. These meetings occurred at American Greetings' corporate headquarters in Cleveland, Ohio during 1989 and during telephone conversations between Mr. Campisi, Mr. Lowenthal, and others who assisted them on the project. American Greetings accepted Mr. Campisi's recommendation and the company's upper management made the affirmative decision to keep the policies' existence secret.

17. When it decided to keep the policies secret from its employees, American Greetings necessarily made the decision to violate the law in virtually every jurisdiction in the United States. It has long been the law in Ohio that a life insurance policy cannot be valid without the insured person's knowledge of the policy and consent to it. Ohio has codified its long-standing common law to expressly require the insured person's consent to a policy on his or her life. And like virtually all jurisdictions, the state of Washington, where Richard Charles

Wolfe worked, also required the insured person's consent before any policy could be lawfully issued.

18. The law of Ohio (and other jurisdictions where American Greetings does business, including the states in which American Greetings has large concentrations of unionized employees) created an affirmative duty requiring American Greetings to inform its employees about the policies it intended to buy on their lives and to obtain their consent to those policies. American Greetings breached this duty to disclose the information and instead kept the policies secret. American Greetings' violation of the law requiring knowledge and consent was part of a systematic scheme to deprive its rank-and-file employees of the knowledge that their lives were insured and that American Greetings was using their names and personal information to benefit itself through the policies.

19. Another layer of secrecy, again proposed by Mr. Campisi, included the creation of a trust in Atlanta, Georgia to be the nominal owner of the policies, receive the policy benefits from the insurers, and forward those benefits to American Greetings upon demand. Notably, Georgia is also one of the many of jurisdictions requiring knowledge and consent of the insured person to a policy on his or her life.

20. American Greetings named its trust the "Employees' Benefit Trust of America." Creation of the trust was a sham and served absolutely no purpose concerning the way the secret policies functioned. But by channeling the policy benefits trough the deceptively-named "Employees' Benefit Trust," American Greetings guaranteed that any employee having access to the account would not suspect the company of routinely receiving benefits from life insurance policies. American Greetings also concealed its receipt of death benefits by ensuring that the

money was transferred into an account to which virtually none of its rank-and-file employees had access.

21. The effect of the sham trust was to camouflage the source of American Greetings' revenues from dead employees. Notably, "siting" policies in Georgia and camouflaging the source of the death benefits was a tactic commonplace among Mr. Campisi's clients.

22. As part of its "cooperative partnership" with MBI and Mr. Campisi, American Greetings followed their advice and implemented the same schemes used by Mr. Campisi's other customers to conceal the policies' existence from rank-and-file employees. One Ohio employer, Camelot Music, Inc., for example, acted with the assistance of MBL and Mr. Campisi to keep its policies secret. To further its plan of secrecy, Camelot Music worked with MBL and Mr. Campisi to "site" its policies in Georgia and arranged to have all benefits from the policies paid to a special account used for executive compensation. The executive compensation account was selected specifically to keep the policies secret. The account had little activity and could not be accessed by anyone other than Camelot's accountant. Policy benefits were later transferred from the employer's executive compensation account to its general account so employees would have no way of knowing the origin of the funds. Camelot's former Chief Financial Officer and Vice President of Finance testified:

> Q: Now, Mr. Rogers, Camelot took precautions to prevent the employees from learning of the fact that Camelot had taken insurance on their lives, isn't that correct?
>
> A: That's correct. Yes.
>
> Q: In fact, they even went to the step of making sure that what death benefit proceeds came in did not go into the general account of Camelot; correct?
>
> A: Yes, that's true, because once you let a few people know, a few people are going to tell a few more people and you might as well tell the entire

company. If you make the decision to keep this information limited to a small group, you have to work hard to keep it maintained to a small group.

23. Here, American Greetings used the same tactics as Camelot Music and others to keep the policies secret from its rank-and-file employees. According to American Greetings, the dead peasant insurance plan sold to Camelot Music by MBL and Mr. Campisi was "virtually identical to [the plan] promoted and sold to American Greetings."

24. American Greetings was uniquely knowledgeable about the subject matter of the policies and its employees did not have an equal opportunity to discover the facts. American Greetings' unique and superior knowledge of the transactions imposed a duty upon it to disclose the material terms of the insurance policies to its employees. American Greetings fraudulently concealed claims that its employees' estates have to the policy benefits because it did not make such a disclosure and took other affirmative acts of concealment.

25. Because of American Greetings' acts and omissions, no person of ordinary prudence, including the Wolfe Estate, could have discovered that American Greetings had secretly purchased the policies and illegally received policy benefits as a result of employees' deaths. No person of ordinary prudence could have anticipated that American Greetings would violate applicable law by secretly misusing its employees' identities and personal information to buy insurance policies on employees' lives. Because of American Greetings' intentional efforts to keep the misuse of private information and the policy benefits secret, no person of ordinary prudence could have discovered that American Greetings was holding the policy benefits. As a result, the Wolfe Estate did not discover the claims asserted in this case until 2011 and American Greetings should be equitably estopped from contesting the timeliness of this pleading.

26. The Wolfe Estate did not learn, and had no reason to know, that American Greetings used Wolfe's identity and personal information or had received policy benefits from

his death until 2011 when counsel for American Greetings first confirmed that the company had, in fact, insured Wolfe's life for American Greetings' benefit.

### CLAIM ONE—AMERICAN GREETINGS MISAPPROPRIATED ITS EMPLOYEES' NAMES AND IDENTITIES TO BENEFIT ITSELF

27. Wolfe, like all others similarly situated, owned the exclusive use of his own name and identity in so far as that use could be of benefit to him or to others. His right to such use was in the nature of a property right, for the exercise of which an exclusive license may be given to a third person.

28. American Greetings wrongfully appropriated the use of the names and identities of its employees, specifically including Wolfe, for a commercial purpose when it bought the secret policies insuring its employees' lives. Each employee's name and identity had a commercial value onto itself and without each individual name and identity, American Greetings could not have obtained the life insurance policy or investment opportunity the policies offered. American Greetings needed the employee's name to place the policy on the life of a human being. It need the employee's age, date of birth, and sex so the insurance company could price the policy and generally apply the associated actuarial tables. American Greetings also needed the employee's social security number to monitor the whereabouts of former employees and allow its agents and insurers to conduct "death sweeps," (computerized sweeps of national Social Security Administration computerized records and other similar databases) to learn whether an employee or former employee had died and thereby recognize the opportunity to claim death benefits.

29. American Greetings misappropriated Wolfe's name and identity and those of other employees to obtain a pecuniary benefit for itself—the investment returns from the policy and the policy benefits following the employees' deaths. The monetary benefit that American

Greetings received as a result of its wrongful use of these names and identities is an appropriate (although not exclusive) measure of actual damages.

### CLAIM TWO—AMERICAN GREETINGS BREACHED ITS FIDUCIARY DUTY BY USING ITS EMPLOYEES' IDENTITIES AND PERSONAL INFORMATION TO BENEFIT ITSELF

30. Wolfe, like all of American Greetings' employees, provided the company with access to his private identity information, including his name, age, date of birth, and social security number, as a condition of employment. Like all employees, Wolfe reasonably expected that American Greetings would safeguard his identity and personal information.

31. American Greetings held its employees' sensitive, private information in confidence and general state of trust. Moreover, because of its position of superiority and influence, American Greetings acted as a fiduciary in regard to the protection and safeguarding of its employees' private information.

32. American Greetings had the right to use its employees' identities and private information only for legitimate business purposes. But by using its employees' identities and personal information to benefit American Greetings through investments in the secret life insurance policies at issue here, American Greetings breached its fiduciary duty to Wolfe and others.

33. The Wolfe Estate and all other similarly situated estates are entitled to damages and to disgorge all pecuniary benefits American Greetings received from its breach of fiduciary duty. And because American Greetings' conduct was intentional, punitive damages are also appropriate.

### CLAIM THREE—IN THE ALTERNATIVE, AMERICAN GREETINGS WAS UNJUSTLY ENRICHED THROUGH THE RECEIPT OF POLICY BENEFITS, INTEREST AND INVESTMENT RETURNS

34. As described above, American Greetings could not have obtained the life insurance policies at issue here, the interest and investment returns they created, or the death benefits, without the unauthorized and improper use of its employees' identities and personal information. American Greetings took the identities and personal information from its employees without their consent and thereby received an improper benefit from them. American Greetings was obviously aware of this benefit. It was also benefitted and enriched under circumstances where it would be unjust to retain the benefit without payment to the employees' estates by virtue of using its employees' identities and personal information to generate the investment returns, interest and death benefits from the secret policies. The Wolfe Estate and members of the putitive class are entitled to the recovery of those benefits from American Greetings.

### CLAIM FOUR—IN THE ALTERNATIVE, THE WOLFE ESTATE IS ENTITLED TO THE POLICY BENEFITS BECAUSE AMERICAN GREETINGS HAD NO INSURABLE INTEREST IN WOLFE'S LIFE

35. Because Wolfe was a rank-and-file employee, American Greetings did not have an insurable interest in his life. Wolf was never a corporate officer, director or executive of American Greetings and his death did not cause any hardship to the company. American Greetings, having no insurable interest, was therefore an unlawful beneficiary and the Wolfe Estate is entitled to all benefits that American Greetings received from the policy on Wolfe's life.

### CLASS ACTION ALLEGATIONS

36. The Wolfe Estate asks the Court to certify a plaintiff class under FED. R. CIV. P. 23(b)(3). The Court may certify this case as a class action because: (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

37. The Wolfe Estate proposes defining the class as:

> the Estates of all persons whose deaths resulted in the payment of life insurance policy benefits to American Greetings under the policies of corporate owned life insurance and who resided in states other than Arkansas or Oklahoma on the date the insurance policy insuring his or her life became effective and except the estates of persons who were ever officers of American Greetings or members of its board of directors.

38. The Wolfe Estate estimates that there are between 300 and 500 members of the putitive class.

39. Adequacy of Representation: The Wolfe Estate is willing and prepared to serve the Court and proposed class in a representative capacity with all of the obligations and duties material thereto. It will fairly and adequately protect the interests of the class and has no interest adverse to the class or in conflict with the class. The Wolfe Estate's self interest is co-extensive with, and not antagonistic to, the interest of the absent class members. The Wolfe Estate has also retained the services of counsel who are experienced in complex class action litigation and cases involving this "dead peasant" insurance. That counsel will adequately prosecute this action and will assert, protect and otherwise represent the named class representatives and absent class members.

40. Common Questions of Law and Fact: Common issues predominate over any other matters in this litigation. The decedents whose estates the class members represent had their identities and private information misappropriated by American Greetings so that it could

invest in secret insurance policies on its employees lives. The pivotal issues in this case, which are common to all class members, are: (1) American Greetings' use of employees' names, ages, dates of birth, sex and Social Security numbers without the employees' consent, (2) whether the unauthorized use of another's name, age, date of birth, sex and Social Security number constitutes a misappropriation under Ohio law, (3) the duty owed by American Greetings to safeguard and hold in trust employees' identities and private information, (4) whether American Greetings breached a duty owed to employees to safeguard and keep confidential employees' private information when it used that information to benefit American Greetings, (5) whether American Greetings was unjustly enriched when it used its employees' identities and private information to secretly insure its employees' lives and receive insurance benefits, interest, and investment returns following their deaths, (6) the lawful measure of damages sought by class members (i.e. the policy benefits paid to American Greetings with all associated interest and investment returns) and (7) American Greetings' active concealment of the secret policies and its use of employee's names and private information. Every issue relating to the Wolfe Estate's entire case-in-chief is common to all class members and should therefore be decided on a class-wide basis.

41. **Impracticality of Joinder:** The individual class members are so numerous that joinder of them all is impracticable. As stated above, the Wolfe Estate estimates that the putitive class is comprised of between 300 and 500 estates of deceased, former employees of American Greetings. These estates are located across the country, making it impracticable to join them all here.

42. **Facts and Circumstances Demonstrating Typicality:** Every class member has a tangible and legally cognizable interest at stake in this action. The claims of the Wolfe Estate

and absent class members have a common origin and share a common basis. Here, the Wolfe Estate's liability claims are premised on American Greetings' unauthorized and improper use of Wolfe's identity and private information to purchase insurance on his life and receive policy benefits, interest and investment returns following his death. Putative class members would also premise American Greetings' liability on the same facts and theories. The Wolfe Estate seeks the policy benefits paid to American Greetings with all associated interest and investment returns, as would all class members. Thus, the legal arguments and relief sought by the Wolfe Estate are the same as those that would be made and sought by every class member.

43. Facts and Circumstances Supporting Certification Under Rule 23(b)(3): Factors bearing on the assessment of superiority are: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action. The Wolfe Estate believes there is only one other case against American Greetings involving its "dead peasant" policies and that is an action brought by an estate that would not fall within the proposed class defined here. There is no indication that individual members of the putative class have any interest in controlling litigation outside this forum. The first two factors therefore weigh in favor of certification. The desirability of resolving all of the class' claims in one forum is obvious and also weighs in favor of certification. The final element of the superiority analysis concerns "the difficulties likely to be encountered in the management of a class action." The management of this case as a class action should not be difficult. As described above, the elements of each class member's case-in-chief, including damages, may be

determined class-wide. The Court need only decide whether American Greetings had the right to use its employees' identities and private information to benefit American Greetings through the secret insurance policies it placed on employees' lives and, if it did not, calculate the policy benefits, interest and investment returns American Greetings received from their deaths.

## PRAYER

The Wolfe Estate, individually and on behalf of all others similarly situated, asks for the following:

(a) The prompt certification of a plaintiff class defined above;

(b) a final judgment awarding the Wolfe Estate and members of the putative plaintiff class all pecuniary benefits, including investment returns, interest, and life insurance policy benefits American Greetings received from the deaths of those former employees whose estates form the putative class;

(c) punitive damages; and

(d) pre-judgment and post-judgment interest in an amount allowed by law.

The Wolfe Estate prays for costs and attorneys' fees, and any other relief, in law or equity, to which it and the class members are entitled.

Respectfully submitted,

**MURRAY AND MURRAY CO., L.P.A.**

Dennis E. Murray, Jr.
Margaret M. Murray
111 East Shoreline Drive
Sandusky, Ohio 44870-2517
Telephone: (419) 624-3000
Facsimile: (419) 624-0707


**MCCLANAHAN • MYERS • ESPEY, L.L.P**.

By:___/s/ Michael D. Myers_____
Michael D. Myers (*Pro Hac Vice*)
Robert H. Espey, II (*Pro Hac Vice*)
3355 West Alabama, Suite 210
Houston, Texas 77098
Telephone: (713) 223-2005
Facsimile: (713) 223-3664

**ATTORNEYS FOR THE PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on March 28, 2012, a copy of this amended complaint was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

By: /s/ Michael D. Myers
     Michael D. Myers